United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHERYL MAY RIMAS EUGENIO,

Plaintiff,

v.

JOHNNY BENSON EUGENIO,

Defendant.

Case No. 23-cv-02832-HSG

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 50

Pending before the Court is Plaintiff Sheryl May Rimas Eugenio's motion for summary judgment. Dkt. No. 50. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below, the Court will **GRANT** the motion.

## I. BACKGROUND

While living in the Philippines, Sheryl May Rimas Eugenio ("Plaintiff" or "Ms. Rimas") met and became engaged to Johnny Benson Eugenio ("Defendant" or "Mr. Eugenio"), a U.S. citizen. In October 2016, Mr. Eugenio filed a visa petition for Ms. Rimas and her daughter. Dkt. No. 1 ("Compl.") ¶¶ 12, 44, 45, 49; Dkt. No. 1-2, Ex. 2 (Form I-129F). On April 26, 2017, Ms. Rimas and her daughter entered the United States on K-1 and K-2 non-immigrant visas, Compl. ¶¶ 52, 54, 56, and within 90 days, Ms. Rimas and Mr. Eugenio got married. *Id.* ¶ 58. On June 29, 2017, Ms. Rimas applied for residency. *Id.* ¶ 59; Dkt. No. 1-7, Ex. 7 (Form I-485). As part of sponsoring Ms. Rimas and her daughter's residency application, Mr. Eugenio signed and filed Affidavits of Support for both Ms. Rimas and daughter. *See* Compl. ¶¶ 58, 65; Dkt. No. 1-1, Ex. 1 ("Rimas Affidavit"), Dkt. No. 60-1, Ex. 1 ("Child Affidavit"). The Affidavits contain a term that required Mr. Eugenio to, upon conferral of their residency status, "provide the sponsored

immigrant(s) whatever support is necessary to maintain the sponsored immigrant(s) at an income that is at least 125 percent of the Federal poverty guidelines for his or her household size." *See, e.g.*, Rimas Affidavit at 7. On June 3, 2019, upon USCIS's approval of her residency application, Ms. Rimas and her minor daughter became lawful permanent residents. Compl. ¶¶ 69–71.

Around three years later, in July 2022, Ms. Rimas moved out of the home she shared with Mr. Eugenio. *Id.* ¶ 74. Divorce proceedings commenced in California state court, and on November 1, 2022, Mr. Eugenio was ordered to provide Ms. Rimas $1,284 per month in spousal support, retroactive to July 2022. *Id.* ¶ 76; Dkt. No. 1-8, Ex. 8 (alimony order); Dkt. No. 58 ("Eugenio Supp.") ¶ 4. On February 6, 2023, their divorce was finalized, and the settlement agreement entered with the final judgment directed Mr. Eugenio to continue providing support payments at the same rate. Compl. ¶¶ 77–78; Dkt. No. 1-9, Ex. 9 (order dissolving marriage).

Since leaving their shared residence in July 2022, Ms. Rimas and her daughter have lived with Ms. Rimas' parents in their one-bedroom apartment, and since May 2023, Ms. Rimas has received food stamps with a monthly value of $136 through the CalFresh program. Compl. ¶ 11; Dkt. No. 50-1, Plaintiff's Declaration re Motion for Summary Judgment ("Rimas Decl.") ¶¶ 10, 24. Ms. Rimas maintains that since splitting up, she has been unemployed and has earned only $80 from babysitting. Rimas Decl. ¶ 22. She additionally maintains that while Mr. Eugenio has been making alimony payments in compliance with the court order, he started unilaterally reducing them in October 2023 and is now behind. *Id.* ¶ 23.

On June 8, 2023, Ms. Rimas filed this action. Plaintiff's complaint alleges a breach of contract claim based on Mr. Eugenio's alleged failure since July 2022 to support her household with the basic level of income promised in the Affidavits of Support. *See generally* Compl. To remedy Mr. Eugenio's breach of his financial support obligation, Ms. Rimas seeks damages and specific performance of the contract.

On July 21, 2023, Mr. Eugenio, proceeding pro se, answered the Complaint. Dkt. No. 14 ("Answer"). In it, he raises the affirmative defense of "Mitigation of Damages," arguing that Plaintiff "has made no effort to find a job or seek gainful employment" in order to mitigate or avoid damages. *Id.* ¶ 8.

United States District Court
Northern District of California

On February 22, 2024, Ms. Rimas filed a motion for summary judgment, seeking back-owed support and specific performance of the Affidavits of Support per her breach of contract claim. Dkt. No. 50 ("Mot."). Defendant belatedly opposed on March 19, 2024, arguing that the Court should offset the amount due to Ms. Rimas based on her receipt of various benefits (e.g. alimony, familial support). Dkt. No. 55 ("Opp."). Plaintiff filed a reply on March 21. Dkt. No. 56 ("Reply"). On April 3, 2024, the Court ordered the parties to provide supplemental briefing concerning the relevant household size for purposes of calculating income under the Federal Poverty Guidelines ("FPG").[1] Dkt. No. 57. Mr. Eugenio filed his supplemental brief on April 5. Dkt. No. 58 ("Eugenio Supp."), and Ms. Rimas filed her supplemental brief on April 10, Dkt. No. 59 ("Rimas Supp."). The motion is now ready for disposition.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute is "genuine" if there is evidence in the record sufficient for a reasonable trier of fact to decide in favor of the nonmoving party. *Id.* But in deciding if a dispute is genuine, the court must view the inferences reasonably drawn from the materials in the record in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986), and "may not weigh the evidence or make credibility determinations," *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997), *overruled on other grounds by Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008). If a court finds that there is no genuine dispute of material fact as to only a single claim or defense or as to part of a claim or defense, it may enter partial summary judgment. Fed. R. Civ. P. 56(a).

[1] While Ms. Rimas presupposed in her motion that the relevant household size is two for this calculation, the Affidavit submitted along with the Complaint only identified Ms. Rimas – as opposed to Ms. Rimas *and* her daughter – as an intending immigrant, and did not specify the total number of persons sponsored in the Affidavit. Accordingly, the Court directed the parties to clarify whether the inclusion of just Ms. Rimas on the Affidavit attached to the Complaint created a triable issue of fact as to (1) the relevant household size that Mr. Eugenio is contractually obligated to provide for, and consequently (2) the amount of damages Mr. Eugenio owes to Ms. Rimas for any breach. *See* Dkt. No. 57.

## III. DISCUSSION

### A. Affidavit of Support

#### i. Background

Under the Immigration and Nationality Act ("INA"), an immigrant seeking admission to the United States is inadmissible if the immigrant "is likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A); 8 C.F.R. § 213a.2(a). Individuals who would be inadmissible for this reason may become admissible if their sponsor executes an Affidavit of Support. *See* 8 U.S.C. § 1183a(a)(1); *see also Shumye v. Felleke*, 555 F.Supp.2d 1020, 1023 (N.D. Cal. 2008). The purpose of the Affidavit of Support is to prevent an immigrant from becoming a public charge. *See Erler v. Erler ("Erler I")*, 824 F.3d 1173, 1178–79 (9th Cir. 2016); *Wenfang Liu v. Mund*, 686 F.3d 418, 422 (7th Cir. 2012), *as amended* (July 27, 2012).

By signing an Affidavit of Support, a sponsor agrees to provide support to maintain the sponsored immigrant at an annual income that is not less than 125% of the FPG while the Affidavit of Support remains enforceable. *See Cyrousi v. Kashyap*, 386 F.Supp.3d 1278, 1282 (C.D. Cal. 2019) (citing 8 U.S.C. § 1183a(a)(1)(A)); *see also Erler I*, 824 F.3d at 1175. Once executed, the Affidavit of Support functions as a contract between the sponsor and the U.S. Government for the benefit of the sponsored immigrant, and of any Federal, State, or local governmental agency or private entity that administers any "means-tested public benefits program." *Erler I*, 824 F.3d at 1175 (citing 8 U.S.C. § 1183a(a)(1)(B)). Both the sponsored immigrant and the entity that provides the public benefit to the sponsored immigrant may enforce the Affidavit of Support against the sponsor. *Id.*

The sponsor's financial support obligation under an Affidavit of Support terminates only when the benefitted immigrant: (1) becomes a U.S. citizen; (2) works or receives credit for 40 qualifying quarters of coverage under the Social Security Act; (3) loses their status as a lawful permanent resident and departs the United States; (4) becomes the subject of a new Affidavit of Support; or (5) dies (collectively, the "Terminating Events"). *See id.* at 1176–77 (citing 8 C.F.R. § 213a.2(e)(2)(i), 8 U.S.C. § 1183a(a)(2)-(3)).

**ii. Application**

Ms. Rimas argues that Mr. Eugenio executed valid Affidavits of Support for her and her daughter, that they gained residency status on the basis of those Affidavits of Support, and that since July 2022, Mr. Eugenio has failed to maintain her household's income at 125% of the federal poverty guidelines as the Affidavits of Support obligate him to. Therefore, Ms. Rimas moves for summary judgment, claiming there is no genuine dispute that Mr. Eugenio breached his obligations. She argues that his breach entitles her to $14,670 in damages as of February 2024 for back-owed support since July 2022 and an order of specific performance directing Mr. Eugenio to provide her the support necessary to maintain her household at an income level not less than 125% of the FPG for a family of two. *See* Mot.

Here, there is no genuine dispute that Defendant executed the Affidavits of Support and that he consequently remains obligated to support Ms. Rimas' household of two at an income level not less than 125% of the FPG. *See* Eugenio Supp. ¶ 3 ("I am responsive for maintaining my ex-spouse at a level of 125% of the Federal Poverty Guidelines[.]").[2] For example, Mr. Eugenio has not suggested or demonstrated that any of the Terminating Events have occurred.

Instead, Mr. Eugenio maintains that by not securing employment or naturalizing, Ms. Rimas is responsible for failing to mitigate any damages, and further, that certain inputs – namely

[2] Mr. Eugenio has failed to create a genuine dispute as to Ms. Rimas' household size. In the supplemental brief he filed, Mr. Eugenio concedes that he is "responsible for maintaining [his] ex-spouse at a level of 125% of the Federal Poverty Guidelines," but argues that because he "did not execute a separate [Affidavit] for his stepdaughter[,] . . . [he] is not financially obligated to pay [his] stepdaughter any financial support under the law." Eugenio Supp. This claim is not sufficient to introduce a genuine dispute. For one, Ms. Rimas, in response, filed a copy of the Affidavit of Support Mr. Eugenio executed for her daughter, which she obtained from USCIS through a Freedom of Information Act Request. Rimas Supp.; Dkt. No. 60-1. This affidavit, signed and executed by Mr. Eugenio, identifies Sheryl May Rimas as the "principal immigrant" and her daughter as "Family Member 1," and notes "2" as the "total number of immigrants" sponsored on the affidavit. Child Affidavit at 2 (Part 2: 1.a-1.c), 3 (Part 3: 4.a-4.c, 29). The Child Affidavit is susceptible to only one interpretation, which is that Mr. Eugenio executed affidavits on behalf of two people: Ms. Rimas *and* her minor daughter. Even putting that conclusive evidence aside, Mr. Eugenio himself admitted in his answer that "Ms. Rimas has had household size of two for purposes of Mr. Eugenio's support obligations under the Affidavit of Support." Answer ¶ 3 (admitting Compl. ¶ 79). This admission is "conclusively binding" on Mr. Eugenio. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). His attempts to introduce a *genuine* dispute at this late stage are therefore unavailing, as there is no evidence in the record sufficient for a reasonable trier of fact to decide in his favor on this issue. *See Anderson*, 477 U.S. at 248.

alimony, in-kind familial assistance, food stamps, and gifts – should qualify as "income" and thereby reduce (or even eliminate) what he owes Ms. Rimas under the Affidavits of Support. Mr. Eugenio does not provide estimated monetary values for these inputs, and he does not specifically argue that when aggregated they bring Ms. Rimas' income to 125% of the FPG for a household of two during the relevant period. However, since Mr. Eugenio proceeds pro se, the Court observes that if these inputs are found to qualify as income, they conceivably *could* add up to a total amount that brings Ms. Rimas' income over the 125% FPG threshold, such that he would not be in breach of his support obligations under the Affidavits. But even if they fall short of that threshold – meaning that Mr. Eugenio is in breach of his obligation to maintain Ms. Rimas' household at the mandated level – they would have the effect of reducing the total damages he owes flowing from that breach.

**A. Duty to Mitigate**

In his Answer, Defendant argues that because "Plaintiff has made no effort to find a job or seek gainful employment," she has wrongfully failed to mitigate damages such that – presumably – any award should be commensurately reduced or eliminated. Answer ¶ 8. The Court disagrees. While the Ninth Circuit has not opined directly on this issue, the great weight of district and sister circuit authority supports the proposition that "traditional contract defenses" – of which mitigation is one – "cannot be used to avoid support obligations" arising out of a support affidavit. *Burkhalter v. Burkhalter*, No. EDCV19272JGBSPX, 2020 WL 1659263, at *4 (C.D. Cal. Feb. 28, 2020); *see also, e.g.*, *Dorsaneo v. Dorsaneo*, 261 F. Supp. 3d 1052, 1054 (N.D. Cal. 2017), (rejecting applicability of common law defenses of fraud in the inducement and estoppel in the context of an I–864 affidavit), *aff'd*, 780 F. App'x 532 (9th Cir. 2019); *Li Liu v. Kell*, 299 F.Supp.3d 1128, 1131 (W.D. Wash. 2017) ("The federal law underlying the I–864 Affidavit clearly specifies the instances in which the support obligation can be avoided . . . . None of the criteria are met by an immigrant's willful failure to seek employment.")

Other circuit courts have provided persuasive reasoning as to why this is the right approach. The Seventh Circuit reasoned that because reading a failure to mitigate defense into the controlling statute would not serve the stated statutory goal of "preventing the admission to the

United States of any alien who 'is likely at any time to become a public charge[,]'" the common law principle must "give[] way." *Wenfang Liu*, 686 F.3d at 422. In particular, the court identified no basis to interpret an immigrant's "failure to mitigate" as an "excusing condition" to the duty of support where the statute did not identify it as one and where doing so would only advantage the sponsor rather than the intended beneficiaries of the obligation under a Form I-864: the "federal and state taxpayers and . . . the donors to organizations that provide charity for the poor." *Id.* The Seventh Circuit therefore rejected the premise that a sponsored immigrant's failure to mitigate damages by seeking employment had the effect of terminating or reducing a sponsor's support obligations.

The Eleventh Circuit came to a similar conclusion in *Belevich v. Thomas*, 17 F.4th 1048 (11th Cir. 2021). There, the defendant sponsor argued that because the relevant regulations are silent as to "the equitable reasons to terminate the obligation of support," the court could permit additional equitable defenses. The court disagreed, concluding that "[b]ecause [it] read the text as identifying an exclusive list of terminating events, [it] cannot add [the] equitable defenses [of unclean hands, anticipatory breach, and equitable estoppel] to that list." *Id.* at 1053. Like the *Wenfang Liu* court, the *Belevich* court further observed that permitting additional, unenumerated equitable defenses would be "inconsistent" with the purpose of the statutory scheme, which is geared towards preventing immigrants from becoming "public charges." If sponsors could raise defenses that concerned sponsored immigrants' acts – rather than those that had bearing on their becoming public charges – and in so doing "cut off financial support [to the immigrant], the public would have to shoulder the financial responsibility that the sponsor had voluntarily assumed." *Id.* Given the incongruity of that result, the court affirmed the lower court's rejection of equitable defenses.

The Court is persuaded that this approach is fair and reasoned. Accordingly, it concludes that Ms. Rimas' alleged failure to mitigate Mr. Eugenio's damages by seeking or securing employment (or by trying to naturalize as a U.S. citizen) is not a basis to terminate or reduce his support obligation. While the Court "recognize[s] that [this] decision may impose a heavy burden on [] sponsors" like Mr. Eugenio, that is the nature of the bargain: "[t]he affidavit imposes a one-

United States District Court
Northern District of California

way obligation on [Mr. Eugenio] to support [Ms. Rimas' household] without any counter-promises by the United States or [Ms. Rimas]." *Belevich*, 17 F.4th at 1052.

**B. Calculating "Income"**

The Court next turns to considering whether the inputs that Mr. Eugenio points to – alimony, familial support, food stamps, and gifts – qualify as Ms. Rimas' "income." The Court makes this inquiry in order to determine whether Ms. Rimas' income is above or below the 125% of FPG threshold mandated by the Affidavits, and accordingly whether Mr. Eugenio is in breach of his obligation arising from the Affidavits to maintain her household at this threshold. The Court concludes that he is.

**i. Alimony**

Ms. Rimas' complaint and motion contemplate offsetting alimony payments against the 125% of FPG threshold – the exact result Mr. Eugenio urges. *See* Compl. ¶¶ 81, 83; Mot. at 28; Eugenio Supp. ¶ 6. Since the parties therefore agree that Mr. Eugenio's alimony payments (which are pegged at $1,284 per month, effective July 2022) can be construed as income to Ms. Rimas, the Court does not further analyze the issue. Instead, it describes the result that Ms. Rimas suggests flows from this conclusion, which is that the following figures are the maximum allowable alimony offsets during the relevant period: $7,704 in 2022 (for six months); $15,408 in 2023; and $1,284 in 2024 (through February 2024 [non-inclusive]).[3]

**ii. Familial Support**

In her motion, Ms. Rimas argues that "[she] and her minor child are treated as a household of two for calculating damages, regardless of whether they benefit from residing with the Plaintiff's parents." Mot. at 15–16. Mr. Eugenio disagrees, and contends that "[t]he amount of in kind benefits Sheryl is receiving should offset the amount of support she is requesting." Reply at 4. The Court finds that the Ninth Circuit's decision in *Erler I* requires a ruling in Plaintiff's favor on this issue. *Erler I*, 824 F.3d 1173 (9th Cir. 2016).

[3] The Court observes that these figures credit Defendant with making alimony payments that Plaintiff alleges that he has not satisfied in full. *See* Compl. ¶ 76 n.1. So to the extent either party can take issue with the amount of alimony being construed as income, it is Plaintiff.

In that case, the court grappled with how to "measure the immigrant's post-separation household size and the immigrant's post-separation income" where the sponsored immigrant, Ayla, was no longer living in the sponsor's household and was instead living with her adult son, Dogukan, who "use[d] his income to pay rent and other living expenses for both himself and Ayla." *Id*. at 1176–77. The lower court concluded that Ayla and Dogukan "constituted a two-person household for purposes of the affidavit of support, and that their combined income must be used to determine whether Ayla's income was at least 125% of the poverty guidelines." *Id*. at 1178. On appeal, the Ninth Circuit found that this conclusion was "untenable" for the following reason: "If a sponsor's duty under the affidavit of support is measured by the immigrant's post-separation household size and household income, then the sponsor would have to support all members of the immigrant's post-separation household in the event that the household's income fell below 125% of the poverty guidelines for a household of that size." *Id*. In order to avoid such a result and honor the expectations at the time of executing the Affidavit of Support, the court held that "in the event of a separation, the sponsor's duty of support must be based on a household size that is equivalent to the number of sponsored immigrants living in the household, not on the total number of people living in the household." *Id*. In other words:

> [W]hen a sponsored immigrant separates from the sponsor's household, the sponsor's obligation under the affidavit of support is to provide the immigrant with whatever support is necessary to maintain him or her at an annual income of at least 125% of the poverty guidelines for a one-person household. If the sponsor agreed to support more than one immigrant, and those immigrants separate from the sponsor's household and continue to live together, then the sponsor must provide them with whatever support is necessary to maintain them at an annual income of at least 125% of the poverty guidelines for a household of a size that includes all the sponsored immigrants. When measuring the immigrant's income, the court must disregard the income of anyone in the household who is not a sponsored immigrant.

*Id*. at 1179–80.

The facts at hand are analogous to those presented in *Erler*. Like Ayla, Ms. Rimas and her daughter now live with relatives who are not beneficiaries of the Affidavits of Support and are covering joint household expenses such as rent and food. And like Ayla's ex-husband, Mr.

Eugenio argues that Ms. Rimas' familial support should be imputed to her as income. Applying the *Erler I* holding to this case, the Court finds that it must look only to whether Ms. Rimas' income is at least 125% of the FPG for a household of two, and must disregard the income of Ms. Rimas' parents – including to the extent that their income is used to cover rent and household expenses to Ms. Rimas' benefit. Though Mr. Eugenio argues that Ms. Rimas derives "in-kind" benefits from living with her parents that should qualify as income and reduce, dollar-for-dollar, the damages he must pay, this approach is not the one the Ninth Circuit endorsed, as it necessarily involves consideration of the income of non-sponsored immigrants in Ms. Rimas' household.[4] And as *Erler I* instructs, there is a reason why consideration of this income is improper under the circumstances. Even if Ms. Rimas is perceived as "receiving a windfall" by living with relatives *and* receiving benefits pursuit to the Affidavits of Support, "relieving the sponsor of his duty of support when the immigrant is fortunate enough to find another person willing to provide the necessary support could itself be considered a windfall to the *sponsor*," a result that is unwarranted where "the sponsor is not an intended beneficiary of the affidavit-of-support requirement." *Erler I*, 824 F.3d at 1179 (citing *Wenfang Liu*, 686 F.3d at 422) (emphasis added). Therefore, support from "charitable third parties" such as family members does not justify "sponsors . . . escap[ing] their support obligations by withholding payments[.]" *Id.*

**iii. Food Stamps**

Ms. Rimas argues that the value of the food stamps she receives should not be considered "income" under 28 U.S.C. section 1183a because "income" under the act should be understood to mean "taxable income" – which food stamps are not. Mot. at 15–27. The Court disagrees, finding the reasoning in *Erler II*, which was upheld on appeal, persuasive. *See Erler v. Erler*, No. 12-CV-02793-CRB, 2017 WL 5478560, at *6 (N.D. Cal. Nov. 15, 2017) ("*Erler II*"), *aff'd*, 798 F. App'x 150 (9th Cir. 2020) ("*Erler III*").

---

[4] Further, the court on remand had occasion to consider the narrower question of whether the money Dogukan paid to cover Ayla's portion of the rent should be considered Ayla's income. The court did not find that it should. *Erler v. Erler*, No. 12-CV-02793-CRB, 2017 WL 5478560, at *6 (N.D. Cal. Nov. 15, 2017) ("*Erler II*") ("The rent she is allegedly responsible for covering is not income under 8 U.S.C. § 1183a."), *aff'd* 798 F. App'x 150 (9th Cir. 2020) ("*Erler III*").

United States District Court
Northern District of California

The court in *Erler II* contended with the same argument presented here concerning food stamps, and did not ultimately look to that benefit's taxable status as the analytical lodestar. Instead, it observed that even though they are not taxable, classifying food stamps as income under section 1183a appropriately balances the relevant incentive structures. In particular, the court found significant that to the extent that sponsored immigrants rely on food stamps to keep their income above 125% of the FPG, the government can recover that amount from the immigrants' sponsors. *Id.*; *see also* 8 U.S.C. § 1183a(a)(1)(B) ("[the Affidavit] is legally enforceable against the sponsor by . . . any State (or any political subdivision of such State) . . . ."); 8 U.S.C. § 1183a(b)(1)(A) ("Upon notification that a sponsored alien has received any means-tested public benefit . . . a State[ ]or any political subdivision of a State shall request reimbursement by the sponsor in an amount which is equal to the unreimbursed costs of such benefit."). Classifying food stamps as income, therefore, does not result in a windfall to either the sponsor or the sponsored immigrant, or distort either party's incentives. That is because the sponsor, knowing that food stamps could be recouped by the government, is not incentivized to withhold payments to the sponsored immigrant in the first instance, and the sponsored immigrant, cognizant that double recovery from the state (via food stamps) and the sponsor (via support payments) is foreclosed, is not motivated to apply for food stamps absent a genuine need.[5]

The approach urged by Plaintiff undermines this balance. "If the Court were to hold that the food stamps do *not* qualify as income," Ms. Rimas would be able to collect from *both* the state and from Mr. Eugenio. *Erler II*, 2017 WL 5478560 at *7 (emphasis in original). In other words, "[Ms. Rimas] could receive a double payment and would be incentivized to apply for government assistance as it allows her to extract a windfall above 125% of the Federal Poverty Guidelines," which would be at odds with the statute's purpose of reducing the number of public charges. *Id.*

To avoid this outcome, the Court concurs with other courts faced with this question, *see id.*

[5] Unlike the circumstance in which "charitable third parties" front household necessities, for instance, "the sponsor does not actually get off scot-free when a plaintiff receives means-benefit assistance [such as food stamps]; he is still bound to any governmental agency or third party that provided means-benefit assistance to the sponsored immigrant." *Erler II*, 2017 WL 5478560 at *7.

(citing cases), that "[m]eans-tested public benefits, such as food stamps, are income to the recipient even if they are non-taxable for the purposes of federal income tax reporting." *Erler III*, 798 F. App'x at 151.[6] Plaintiff's damage calculations must therefore be reduced by $136 for every month she received food stamps of that value. *See* Rimas Decl. ¶ 24 (stating that she has received food stamps in the amount of $136 per month since May 2023).

**iv. Gifts**

Mr. Eugenio asserts that Ms. Rimas has received "many gifts" from her parents since their separation, including, for example, a BMW X5. Opp. at 7. Ms. Rimas does not address this argument, though she presumably would argue, in keeping with her prior position, that any gifts would qualify as income only to the extent they are taxable. The Court finds that it need not decide under what circumstances gifts are construed as income, because Mr. Eugenio does not introduce sufficient facts to raise a genuine dispute as to this issue. It was his burden to counter Ms. Rimas' evidence concerning her income, and he has not sufficiently done so. Though the Court recognizes that Mr. Eugenio proceeds pro se, it cannot relax the summary judgment standard to such an extent that unsubstantiated arguments concerning prior gifts of unarticulated value are sufficient to establish a material dispute about Ms. Rimas' income. Therefore, the Court concludes that the 125% of FPG benchmark is not offset based on the purported value of gifts Ms. Rimas received.

**v. Breach**

Even construing alimony payments (both made and credited) and food stamps as income, the Court finds that Ms. Rimas' income during the applicable periods was below 125% of the applicable FPG for a household of two. The monthly delta between 125% of the FPG benchmark and Ms. Rimas' income was $623 in 2022 ($1,907-$1,284), between $554 ($2,054-$1,284-$136-$80) and $770 ($2,054-$1,284) in 2023, and $709 ($2,129-$1,284-$136) in 2024.[7] Accordingly, the Court holds that Mr. Eugenio is in breach of his ongoing financial obligation arising from the

---

[6] As an unpublished Ninth Circuit decision, *Erler III* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

[7] The range noted for 2023 reflects the fact that from May through December, Ms. Rimas received food stamps valued at $136 per month, and that she was compensated $80 for babysitting services.

Affidavits of Support to maintain Ms. Rimas' household at the required income level.

### C. Damages

Given that Mr. Eugenio is in breach of his support obligations, the Court awards Ms. Rimas damages equal to the difference between Ms. Rimas' income (which includes alimony payments and food stamps) and the income he promised to support her at when executing the Affidavits (i.e. 125% of the FPG for a household of two) from July 2022 through the present. However, since Plaintiff's motion only calculated damages as of February 2024 and the Court cannot assume that the parties' financial status has remained the same since that time, a determination of the exact amount of back support payments due to Ms. Rimas through the present will follow entry of this order.

### D. Specific Performance

Plaintiff also requests an order of specific performance that Mr. Eugenio provide continued support under the Affidavits of Support. As considered above, the Court finds there is no genuine dispute that the Affidavits of Support remain presently enforceable against Defendant and that a terminating event has yet to occur. Therefore, on a going-forward basis, Mr. Eugenio must provide any income necessary to maintain Ms. Rimas' household of two at 125% of the poverty line (i.e. the difference between her actual income and 125% of the FPG for a household of two as then in effect) until one of the five Terminating Events of the Affidavits of Support occurs.

## IV. CONCLUSION

The Court **GRANTS** Plaintiff's motion for summary judgment. Dkt. No. 50. In doing so, the Court concludes that:

- Defendant must pay Plaintiff back support payments under the Form I-864, Affidavits of Support equal to the difference between Plaintiff's income (which includes alimony payments and the value of food stamps received) and 125% of the Federal Poverty Guidelines for a household of two from July 2022 through the present;
- Plaintiff is entitled to continuing financial support at 125% of the applicable Federal Poverty Guidelines for a household of two pursuant to the Form I-864, Affidavit of Support until a Terminating Event (as defined at 8 C.F.R. § 213a.2(e)(2)(i)) occurs; and

United States District Court
Northern District of California

- Defendant has a continuing obligation to financially support Plaintiff at 125% of the applicable Federal Poverty Guidelines for a household of two, which shall continue until a Terminating Event (as defined at 8 C.F.R. § 213a.2(e)(2)(i)) occurs.

Within seven days of entry of this order, Plaintiff is **DIRECTED** to file a proposed judgment consistent with these findings. In particular, the proposed judgment must state what amount of back support is presently due, and must support that amount by including the underlying calculations in a completed version of this (or similar) chart:

| **Damages Owed from July 2022–[*DATE*]** | | | | | |
|---|---|---|---|---|---|
| **Period** | **125% of FPG for Household of Two per Period** | **Offset for Alimony** | **Offset for Food Stamps** | **Offset for Other Income** | **Total** |
| 2022 (July-Dec.) | $11,442 ($1,907/mo x 6 months) | $7,704 ($1,284/mo x 6 months) | $0 | n/a | $3,738 |
| 2023 | $24,648 ($2,054/month x 12 months) | $15,408 ($1,284/mo x 12 months) | $1,088 ($136/mo x 8 months) | $80 (babysitting) | $8,072 |
| 2024 (Jan. – [*DATE*]) | | | | | |
| | | | | ***GRAND TOTAL*** | |

This is a simple mathematical exercise: counsel must not include legal argument or citations in the proposed judgment to support the proffered figures or findings.

To the extent Plaintiff's counsel plan to seek attorney's fees after entry of judgment, they must do so in conformance with Federal Rule of Civil Procedure 54.

**IT IS SO ORDERED.**

Dated: 5/1/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge